IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

              v.                                  21-CR-7-V

JOHN STUART,

               Defendant.

_____

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S OMNIBUS PRETRIAL MOTION

      THE UNITED STATES OF AMERICA, by and through its attorney, Trini E. Ross, United States Attorney for the Western District of New York, Laura A. Higgins, Assistant United States Attorney, of counsel, hereby files its response to defendant JOHN STUART's omnibus pretrial motion. *See* Doc. 27.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

      This FBI investigation began as a lead from a national investigation, which received information from international law enforcement partners who dismantled several child pornography sites on the Tor network, often referred to as the "dark web" where users can visit anonymously. During the June 2019 operation, international law enforcement captured the IP addresses of visitors on the dismantled sites. These IP addresses were disseminated to the respective countries and, in the United States, to the districts with venue to prosecute. One such IP address was registered to 1010 Cleveland Drive, Cheektowaga, New York. The information provided by the lead from international law enforcement included the name of

the website, a description of it as a "child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children." The lead also detailed that the website was in operation from approximately October 2016 through June 2019, was located outside of the United States, was seized by the foreign law enforcement authority, and the IP address registered to Stuart's residence was on the site on a particular date and time. Details of the content were verified by the FBI while the site was in operation, which confirmed details about the site including its self-described purpose to "share cp of babies and toddlers," how the site functioned to allow users to make and view postings that contained text, images, video images, and web links directing users to specific content at other websites. FBI Special Agents accessed the site and downloaded digital child pornography content accessible via the website in an undercover capacity.

The June 2019 lead regarding Stuart's IP address at his residence was transmitted to FBI Buffalo in July 2020. Shortly thereafter, the government obtained authorization to use a pen register and trap and trace device (PRTT) on the target broadband account registered at 1010 Cleveland Drive, Cheektowaga, New York. The PRTT monitored the IP activity on the defendant's residence between August and October 2020. The result of the PRTT confirmed an occupant of the residence was utilizing an internet-connected device to frequent the Tor network, and therefore likely the same type of dark web child pornography sites as what was dismantled in 2019.

A federal search warrant was obtained on October 8, 2020 from the Honorable Michael J. Roemer for the residence at 1010 Cleveland. *See* 20-MJ-5207.[1] The search warrant authorized the seizure and subsequent search of the contents of electronic devices.

The search warrant was executed on October 19, 2020. During the search, law enforcement seized:

- 6 electronic devices: an Apple MacBook, a Samsung cellphone, two Western Digital External Hard Drives, a Dell laptop, and a deskop computer tower
- a grow operation inside the residence which consisted of a tent housing approximately 5 mature marijuana plants, 4 smaller plants, all being grown hydroponically.
- approximately one pound of dried marijuana ready for use
- another quantity of approximately 6 pounds of wet marijuana was located (apparently this will produce approximately 1 pound of marijuana once dried)
- Psilocybin mushrooms were also seized (a Schedule I controlled substance)
- 3 firearms: a Glock model 43X, 9 millimeter pistol bearing serial number BNGY234 loaded with 9 rounds of ammunition (this firearm is registered to Stuart on his NYS pistol permit)

Stuart was interviewed by an investigator in the defendant's bedroom and the entire interview was recorded on the body camera of a Cheektowaga PD officer. During the interview, the defendant made significant admissions the government intends to use against him at trial.

## LEGAL DISCUSSION

A.   **THE SEARCH WARRANT FOR THE DEFENDANT'S RESIDENCE WAS LAWFULLY ISSUED UPON A SHOWING OF SUFFICIENT, RELIABLE, NON-STALE PROBABLE CAUSE**

The defendant contests the reliability of the of the information supplied in the application for the search warrant because the foreign law enforcement agency is not identified. *See* Doc. 27-2.  Further, the defendant argues the information offered in support of

---

[1] The government has supplied a copy of this application to the defendant and now supplies a copy under separate cover to the Court for *in camera* review.

probable cause was "clearly stale and not of a sufficiently recent vintage to allow for a finding of probable cause." *Id.* The government maintains the information presented in the search warrant application was sufficient, reliable, and satisfactorily fresh to support the finding of probable cause. Even if this Court disagrees, the good faith exception should apply. *United States v. Leon*, 468 U.S. 897 (1984).

**1.    The Information Offered in Support of the Search Warrant Was Sufficient to Justify a Finding of Probable Cause**

Probable cause for a search warrant exists when, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Probable cause…is not a high bar: It requires only the 'kind of fair probability on which reasonable and prudent people, not legal technicians, act.'" *Kaley v. United States*, 571 U.S. 320, 338 (2014). When reviewing the validity of a search warrant:

> "the duty of [the] court … is simply to ensure that the magistrate had a substantial basis for … conclud[ing] that probable cause existed. A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant."

*United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quotations and citations omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("[A] reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate…."). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit [applying for a warrant] should not take the form of *de novo* review." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 236). "[R]esolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Here, the FLA has provided evidence that a particular IP address "was used to access online child sexual abuse and exploitation material" via one of the websites under investigation. The FLA has not provided further information about the particular material that any individual target accessed or downloaded or evidence that the target registered an account on the Target Website. However, 18 U.S.C. § 2252A(a)(5)(b) prohibits the access of a website with the intent to view child pornography. The statute "does not require a showing that [a defendant] actually viewed illegal content on the site." *United States v. Tagg*, 886 F.3d 579, 587 (6th Cir. 2018). In *Tagg*, the Sixth Circuit reversed a trial court's grant of a motion to suppress evidence seized during a court-authorized search of the residence of a target identified as a user of the "Playpen" Tor child pornography hidden service website. In finding that the warrant was amply supported by probable cause, the court opined that "even if the person never viewed illegal child pornography, knowingly accessing a child-pornography website with the intent to view illegal materials is itself a criminal act" so that "probable cause to search [an offender's] house would exist even if he was 'curiosity shopping' for child porn on [the website] but never actually viewed an illegal image." *Id.* at 587-88; *cf. United States v. Vosburgh*, 602 F.3d 512, 526 (3rd Cir. 2010) (affirming trial court denial of motion to suppress evidence where IP address was tied to attempts to access a link to child pornography; noting that "[a]ttempted possession of child pornography is a federal crime" and therefore evidence of offender's attempts to access a link were "undoubtedly criminal activity.").

There are particular articulable facts contained in the warrant affidavit for this investigation that establish probable cause to believe that, at a minimum, Stuart accessed a Target Website with intent to view child pornography.

*First*, a target who accesses one of the Target Websites made a purposeful choice to use and access the Tor network. Because Tor hidden services cannot generally be accessed

through the traditional internet, only a user who had installed the appropriate Tor software on the user's computer could access one of the websites under investigation. While there are myriad lawful uses of Tor anonymity, an offender's use of Tor to hide his/her identity online while accessing illicit content is some evidence of consciousness of guilt.

*Second*, a target who accessed one of the Target Websites had to find it. The 16 or 56 character web addresses for Tor hidden services – which consist of a series of semi-random characters – are hard to find without purposefully searching for them. Also, hidden service websites on the Tor Network are not "indexed" by search engines—such as Google—to anywhere near the same degree as websites that operate on the open Internet. Accordingly, it is more difficult to perform a Google-type search of hidden service websites than it is to search open Internet websites for particular content of interest. Users interested in accessing child exploitation material (or in advertising child exploitation and pornography websites they operate) therefore keep, maintain, and use directory sites that advertise the web addresses of hidden services that contain child exploitation related content. Those directory sites also operate via the Tor network. Users (and law enforcement agents) use those directory sites to identify new web forums, chat sites, image galleries and file hosts pertaining to thening to the sexual exploitation of children. Such directory sites often identify whether particular sites are then operating, whether child pornography imagery may be found there, and even what types of child pornography are accessible (i.e., boys, girls, or "hurtcore"). They also contain clickable hyperlinks to access those sites. As with other hidden service websites, a user must find the 16-or-56 character web address for a directory site in order to access it.

While it operated, the web addresses for the Target Website was listed on one or more of such directory sites advertising hidden services dedicated to the sexual exploitation of

children.  Accordingly, as articulated in the warrant application, because accessing the Target Website required numerous affirmative steps by the user – to include downloading Tor software, accessing the Tor network, finding the web address for the website, and then connecting to the website via Tor – it is extremely unlikely that any user could simply stumble upon a Target Website without understanding its purpose and content.

Courts have recognized the unique characteristics of Tor child pornography websites and drawn favorable inferences in support of probable cause from them.  *See Tagg*, 886 F.3d at 587 (finding it "unlikely" defendant "stumbled upon" the Playpen hidden service "by accident" because "[t]o access the site, he had to obtain the URL from someone 'on the inside' who could provide the exact sequence of numbers and letters to enter into his browser" which "creat[ed] an inference" that the defendant deliberately accessed the website); *United States v. DeFoggi*, 839 F.3d 701, 706–07 (8th Cir. 2016)(upholding denial of probable cause challenge to residential warrant where the warrant affidavit explained that the pertinent Tor child pornograrnography website "could not be accessed without the installation of appropriate software and knowledge of its exact web address" which a user could find "directly from other users, or from internet postings describing [the website's] content and location;" accessing the website therefore "required numerous affirmative steps by the user, making it extremely unlikely that a user would stumble upon it without knowing that its purpose was to advertise and distribute child pornography and understanding the content to be found there.").

Moreover, the absence of evidence of subscription, membership or download should not defeat probable cause.  Courts have assigned weight to other factors pertinent here, to include the website's design and how prominently it displayed images of child pornography. *See Gourde*, 440 F.3d at 1068 (looking to the website's prominent display of

nude prepubescent females engaging in sexual acts in considering defendant's intent to access or view child pornography); *Martin*, 426 F.3d at 75-76 (online child pornography trading group's welcome page was titled "girls 12 – 16," which made plain "its essential purpose to trade child pornography").   Here, the welcome page and rules of the Target Website renders it unmistakable in its dedication to illicit child pornography.

*Third*, review of data seized by the FBI in the Playpen investigation found that it was exceedingly rare for a registered site user to access such a site and never return.   "Playpen" was a Tor network-based hidden service dedicated to the advertisement and distribution of child pornography that operated from August 2014 until March 2015. Similar to the Target Website, Playpen was a highly categorized web forum with hundreds of thousands of users that allowed users to post and download messages pertaining to child exploitation within forum categories indexed by the age and gender of child victims and the type of sexual activity involved.   In February and March of 2015, the FBI seized and briefly operated the Playpen website for two weeks, using a court-authorized investigative technique to successfully identify IP addresses and other information associated with site users.   FBI review of site data seized from the Playpen website during the operation determined that of over 400,000 total user accounts observed on the Playpen website during its existence, less than 0.02 percent (that is, less than two hundredths of one percent) of user accounts registered an account on the website, accessed a message thread on the website, and then never returned to the site and logged in to the same account.   The warrant articulates these findings.   *See* 20-MJ-5207 at ¶ 29.   While that represents anecdotal data from only one similar website and tracks registered user behavior, that data is useful in supporting probable cause.

*Fourth*, the agent articulated in the warrant affidavit characteristics that are common to individuals who access with intent to view child pornography – such as the tendency to collect or retain child pornography. *See* 20-MJ-5207 at ¶ 41.

In summary, the Magistrate Judge clearly had a substantial basis to conclude that, given the totality of the circumstances, there was a fair probability of finding evidence that the internet user at the Target IP Address accessed or attempted to access child sexual abuse and exploitation material. The affidavit accurately reiterates the FLA's tip that the internet user at the Target IP Address "was used to access online child sexual abuse and exploitation material via a website that the FLA named and described. 20-MJ-5207 at ¶ 24.

## 2.    <u>The Information Offered in Support of the Search Warrant Was Reliable</u>

The defendant argues the anonymity of the FLA renders its information unreliable and analyzes the issue as though the FLA were an unidentified informant. Such misapprehends the law and is unconvincing in that it is contradicted by established precedent. Indeed, the FLA's information should be considered by this Court as hearsay, not as uncorroborated information supplied by an anonymous civilian informant.

As a general matter, the Supreme Court has made clear that "an affidavit relying on hearsay 'is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented.'" *Gates*, 462 U.S. at 241-42 (citing *Jones v. United States*, 362 U.S. 257, 269 (1960)). In this case, there is more than a substantial basis for crediting the hearsay. As the affidavit established, the FLA is a law enforcement agency that is well-known by the FBI and that has a long history of sharing reliable information with the United States. 20-MJ-5207 at ¶ 24. It is well-established that proven, reliable enforcements generally and law enforcement agencies in particular are entitled to considerable credence. *See Ventresca*, 380

U.S. at 111 (stating that law enforcement officers "are plainly a reliable basis for a warrant applied for…"); *see also Velardi v. Walsh*, 40 F.3d 569 (2d Cir. 1994).

There is no doubt that this presumption of credibility extends to reliable foreign law enforcement agencies like the FLA in tis case. The Third Circuit stated this presumption clearly in *United States v. Benoit* in its affirmance of the Coast Guard's reliance on a tip from Grenadian law enforcement authorities based on the fact that the agency was a known and repeat player in a working relationship with the Coast Guard. *United States v. Benoit*, 730 F.3d 280, 285 (3d Cir. 2013) ("[A] tip from one federal law enforcement agency to another implies a degree of expertise and a shared purpose in stopping illegal activity, because the agency's identity is known."). Given this FLA's history of providing reliable tips to the FBI and this FLA's status as a respected law enforcement agency, it was reasonable for the Magistrate Judge to rely on the FLA tip even if no further corroboration had been done. However, corroboration by the FBI was performed by their own agents visiting the Target Website, collecting observations of its content and features and downloading images of child sexual abuse and exploitation material. *See* 20-MJ-5207 at ¶ 17.

The defendant's enumerated questions posed regarding the FLA's identity and details of its information score points as demonstrative of an interested, curious, inquiring mind – but are nothing more than interesting questions. *See* Doc. 27-2 at p. 4. The law simply does not require the defendant be supplied with that information in discovery, nor does it require the affiant in a search warrant application provide those answers to the issuing magistrate. The FLA source of information is unlike a traditional "confidential informant" in material ways – the FLA is a "member" of law enforcement, it is not under arrest, it is not a drug user, it is not even an "individual" but rather an institution, and as a result it has no apparent reason

to manufacture false tips to the United States. The Court should deem the FLA credible and its information reliable, as did the Magistrate Court.

**3.**     **The Information Offered in Support of the Search Warrant Was Not Stale**

Stuart argues the information presented to Magistrate Judge Michael J. Roemer was stale and could not support the finding of probable cause. *See* Doc. 27-2 at pp. 5-11. The pertinent dates supplied to the Magistrate Judge in the application are the following: (1) on May 28, 2019, the IP address registered to Stuart at his residence was used to access the Target Website on the Tor network with intent to view child pornography; (2) on July 24, 2020 surveillance was conducted at Stuart's residence confirming he was present there; and (3) between August 20, 2020 and October 6, 2020, the PRTT confirmed a user of the internet at Stuart's residence accessed the Tor network on 14 separate dates. *See* 20-MJ-5207 at ¶ 32, 35, 38.

"In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, *i.e.*, true at the time of the application, or whether instead it has become stale." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991). "The doctrine of staleness applies when information proffered in support of a warrant application is so old that it cases doubt on whether the fruits or evidence of a crime will still be found at a particular location." *United States v. Lamb*, 945 F.Supp.441, 459 (N.D.N.Y. 1996). "While there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993). Accordingly, "[t]he information offered in support of the application

for a search warrant is not stale if 'there is [a] sufficient basis to believe, based on a continuing

patter or other good reasons, that the items to be seized are still on the premises.'" *United*

*States v. Lacy*, 119 F.3d 742, 745-46 (9th Cir. 1997) (quoting *United States v. Gann*, 732 F.2d

714, 722 (9th Cir.), *cert. denied*, 469 U.S. 1034 (1984)), *cert. denied*, 523 U.S. 1101 (1998).

"[T]he principal factors in assessing whether or not the supporting facts have become

stale are the age of those facts and the nature of the conduct alleged to have violated the law."

*United States v. Diaz*, 176 F.3d 52, 109 (2d Cir.), *cert. denied*, 528 U.S. 875 (1999). "Some types

of evidence are more likely to remain in one location than other types of evidence." *United*

*States v. Patt*, 2008 WL 2915433, *12 (W.D.N.Y. 2008). In addition, "[w]here the criminal

activity is suspected to be ongoing, 'the passage of time between the last described act and the

presentation of the application becomes less significant.'" *United States v. Gayle*, 2009 WL

4667093, *3 (S.D.N.Y. 2009) (quoting *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988),

*cert. denied*, 489 U.S. 1083 (1989)). Accordingly, "[t]he age of the information is relevant only

insofar as it affects the likelihood that evidence will be found at the premises." *See United States*

*v. Zoernack*, 2005 WL 1837962, *2 (S.D.N.Y. 2005).

The information contained in the affidavit in support of the application for a search

warrant for Stuart's residence was not stale. The investigation confirmed that Stuart was the

subscriber of record of the Charter Communications account for the pertinent IP address on

the date the Target Website was accessed. Further confirmation that Stuart was still living at

the residence was accomplished through surveillance of Stuart himself and his registered

vehicle at 1010 Cleveland Drive, Cheektowaga, New York. Although approximately 15

months passed from the date of access of the Target Website on the Tor network to the PRTT,

the data revealed by the PRTT confirmed Stuart (or a user from his residence) was still

accessing the Tor network on a regular basis. In fact, of the approximately 46 days PRTT data

was analyzed between August 20 and October 6, 2020, a user of the internet accessed the Tor network 14 times – that is approximately once every three days. The affiant went on to provide comprehensive details about the means and methods child pornography offenders utilize electronic devices to store images and videos, stating, "[t]he computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography." *See* 20-MJ-5207 at ¶ 40. Further, he detailed the fact that "a computer user's internet activities generally leave traces or 'footprints' in the web cache and history files of the browser used. Such information is often maintained *indefinitely* until overwritten by other data." *Id*. The clear inference one may draw from these facts is that even if Stuart's first and only access of child sexual abuse and exploitation material was the single event in May 2019 when the FLA captured his IP address, there is a high degree of likelihood that forensic evidence of that single access could be found even years later. *See* 20-MJ-5207. This inference was reinforced by the affiant's experience, among a detailed summary, that individuals who access child sexual abuse and exploitation material "typically retain those materials and child erotica for many years." *See* 20-MJ-5207 at ¶ 41. Further, even if those materials were deleted by the user, the affiant explained that "evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools." *Id*.

The affiant did not rely on the access date in May 2019 alone, however, because the PRTT confirmed Stuart (or a user from his residence) was accessing the Tor network regularly and as recently as October 6, 2020 – two days prior to the application. Such information, at the very least, confirmed to the Magistrate Court that an individual residing at 1010 Cleveland Drive still had an electronic device capable of connecting to the internet, that they were using the internet, and that they were using the internet to access the Tor network a/k/a "dark web"

13

– the same avenue used by a user in May 2019 to visit the child pornography hub at the Target Website.

The defendant discounts this information by boldly claiming "[t]here is absolutely nothing inherently nefarious about [the Tor network]" and goes on to allege that it is used by "journalists, lawyers, and parents who do not want their children tracked online." *See* Doc. 27-2. Stuart, however, is none of these: journalist, lawyer, nor parent. The affidavit confirmed Stuart was a 32 year-old paramedic with a private ambulance service in Western New York. Stuart is also apparently childless. The fact is that darknet markets operating on the Tor network, which anonymize its users and vendors, clearly function as an effective black market for illicit goods like drugs, firearms, personal identifying information of others, and unsurprisingly, child sexual abuse and exploitation material.[2]  The defense asks this Court to ignore that fact and require the government to disprove all innocent explanations, even if implausible or demonstrably inapplicable here. "The fact that an innocent explanation may be consistent with the facts alleged…does not negate probable." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985); *United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008) ("[W]e cannot discount facts one by one simply because [the defendant] has suggested hypothetical explanations for them that are consistent with his innocence."); *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983) ("innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands.").

---

[2] *See e.g.* "More than 400 .Onion Addresses, Including Dozens of 'Dark Market' Sites Targeted as Part of Global Enforcement Action on Tor Network" Dep't of Justice, Nov. 7, 2014, *available at* https://www.justice.gov/opa/pr/more-400-onion-addresses-including-dozens-dark-market-sites-targeted-part-global-enforcement

This Court should not discount the significance of Stuart's regular and recent accessing the Tor network, especially given the proof that he used it *at least* once in May 2019 to access horrific and clearly unlawful child sexual abuse and exploitation material.

**4.     Law Enforcement Relied on the Search Warrant in Good Faith and Suppression is Unwarranted**

The Fourth Amendment exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was based on "objective good faith," even though the warrant itself might ultimately be found to be defective. *See United States v. Leon*, 468 U.S. 897, 926 (1984) (observing "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could have not harbored an objectively reasonable belief in the existence of probable cause."); see also, *United States v. Martin*, 157 F.3d 46, 53 (2d Cir. 1998) (holding that because the officers who executed the search warrants acted in good faith, there was no need to suppress evidence thus discovered, even if the search warrant neglected to describe the items to be seized with particularity or even if the warrant was stale when issued). Even if the magistrate judge lacked a substantial basis for concluding probable cause existed for the search warrant, or that the information was "stale" as the defendant argues, the evidence in this case should not be suppressed because the officers relied in good faith up on a search warrant issued by a neutral and detached judge. The defendant has proffered no reason to believe the affiant in this matter was dishonest or reckless in preparing his affidavit, nor that the Magistrate Judge Michael J. Roemer was anything but neutral and detached. The defendant has failed to identify material false statement, made either knowingly, intentionally, or with reckless disregard for the truth,

by law enforcement whatsoever. Accordingly, the rationale of deterrence underlying the remedy of suppression would serve no purpose here. The exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 919. Accordingly, suppression is unwarranted in this matter.

## B.      STATEMENTS

The defendant's only argument in support of suppression of his statements is that they were derivative from the alleged Fourth Amendment violation in connection with the search warrant application. The defendant does not allege any other violation of his constitutional rights by law enforcement in obtaining his statements. Accordingly, the government incorporates its arguments in support of the legality of the search warrant here and reserves its right to respond to any supplemental or alternative arguments the defendant may pursue in the future on this issue.

## C.      DEFENSE REQUEST FOR ADDITIONAL DISCOVERY SHOULD BE DENIED AS MOOT OR PREMATURE.

In federal court, "pre-trial discovery in criminal cases is strictly circumscribed." United States v. Nelson, 606 F. Supp. 1378, 1389 (S.D.N.Y. 1985). The government has fully complied with its obligations in this case by providing substantial voluntary discovery.  The government, therefore, objects to the defendant's discovery demands to the extent that they are moot or request material beyond the scope of the government's Rule 16 discovery obligations.

Rule 16 of the Federal Rules of Criminal Procedure requires the government, at the defendant's request, to produce the defendant's statements and criminal record, as well as certain documents, objects, reports and expert summaries.  The government has already made

such disclosures through delivery of voluntary discovery material to defense counsel and will continue to provide any discoverable materials in conformity with Rule 16 and the defense request.

**D.    THE GOVERNMENT IS IN CONTINUING COMPLIANCE WITH ITS *BRADY* OBLIGATIONS.**

The defendant lists a number of requests that he claims are controlled by Brady v. Maryland, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). *See* Doc. 27-1 at pp. 3-6.

Pursuant to *Brady* and its progeny, the government is under an affirmative duty to provide a defendant with exculpatory evidence, as well as evidence that the defense might use to impeach the government's witnesses at trial. *See United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150 (1972). The government is fully aware of its obligations and responsibilities under *Brady* and acknowledges its continuing duty under *Brady* to produce such material, if and when it is aware of it.

However, *Brady* does not create a constitutional right of pretrial discovery in a criminal proceeding and it does not cover many of the requests made by the defendant. For instance, evidence which is not exculpatory, but relevant for the purposes of impeachment, must be produced to the defense, but need not be turned over in advance of trial. *United States v. Nixon*, 418 U.S. 683, 701 (1974); *United States v. Coppa*, 267 F.3d 132, 145-46 (2d Cir. 2001). It does not require the disclosure of evidence affecting the credibility of prosecution witnesses prior to such time as it would otherwise become available under the discovery rules or the Jencks Act. Impeachment material is normally disclosed at the same time as Jencks Act material –

after the government witness has testified on direct examination.  See 18 U.S.C. § 3500(B); *Coppa*, 267 F.3d at 145-46.

Further, Brady does "not require the government to do defense counsel's pretrial preparation, nor develop defense strategy, nor does it require the government to point out the obvious." *United States v. Larson*, 567 F. Supp. 500, 503 (S.D.N.Y. 1983); *see also United States v. Ruggerio*, 472 F.2d 599, 604 (2d Cir. 1973) ("The purpose of the *Brady* rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him.").

In this case, the government agrees to provide impeachment *Brady* material, i.e., promises of leniency or immunity agreements with government witnesses, plea and/ or non-prosecution agreements and letters or memorandum of understanding regarding such, criminal arrest records of all prosecution witnesses, immoral, vicious or criminal acts committed by witnesses, prior inconsistent statements, any payments to witnesses or family members thereof, and all other promises or considerations given by government personnel to government witnesses or family members thereof, in accordance with the schedule set by the District Court prior to trial and no later than when the government produces and delivers the Jencks Act material in this case.  Courts have routinely held that a prosecutor's compliance with the disclosure of material under the Jencks Act is timely disclosure under *Brady*.  *See United States v. Martino*, 648 F.2d 367, 384 (5th Cir. 1981) ("When alleged *Brady* material is contained in Jencks Act material, disclosure is generally timely if the government complies with the Jencks Act." (citation omitted)); *United States v. Anderson*, 574 F.2d 1347, 1352 (5th Cir. 1978) (same); *United States v. Persico*, 621 F. Supp. 842, 870 n.3 (S.D.N.Y. 1985) (same).

Therefore, the Court should find that the government is in full compliance with its *Brady* and *Giglio* obligations and deny the defendant's motion.

**E.   DEFENDANT'S REQUEST FOR DISCLOSURE OF EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 404(b), 608 AND 609.**

The defendant moves for pretrial disclosure of any evidence the government intends to introduce at trial pursuant to Rules 404(b), 608 and 609 of the Federal Rules of Evidence. The government will provide notice of such information to the defense pursuant to the District Court's trial Scheduling Order, which has yet to be issued.

Rule 404(b) of the Federal Rules of Evidence requires the government to provide "reasonable notice in advance of trial" of the "general nature" of prior uncharged crimes that the government intends to use at trial. No set timetable for notice is required, and evidence the government may seek to offer at trial often changes as the proof unfolds or as possible defenses are revealed at trial. *United States v. Aguirre-Parra*, 763 F. Supp. 1208, 1217 (S.D.N.Y. 1991). The reasonableness of Rule 404(b) notice is determined by the particular circumstances of the case. *United States v. Falkowitz*, 214 F. Supp. 2d 365, 393 (S.D.N.Y. 2002) (permitting disclosure of Rule 404(b) evidence two weeks before trial).

In this case, the defendant has not advanced any concrete reason for early disclosure of Rule 404(b) evidence, *see Falkowitz*, 214 F. Supp. 2d at 393, nevertheless the government will disclose evidence in its possession which might fall within the ambit of Rules 404(b), 607, 608, and 609, and will provide notice of its intention to rely upon such evidence at the time it is ordered to do so by the trial court. The government notes that it has no obligation to provide a defendant with any information that could be used to impeach him pursuant to Rule 608, should he elect to testify. *See United States v. Livoti*, 8 F. Supp. 2d 246, 250 (S.D.N.Y. 1998);

*see also United States v. Song*, 1995 WL 736872, *7 (S.D.N.Y. Dec. 13, 1995) ("Rules 608 and 609 do not require the government to produce notice of impeachment evidence."); *United States v. Comer*, 1996 WL 492704, *1 (N.D.N.Y. Aug. 23, 1996) (premature to disclose impeachment evidence until witnesses testify).

Furthermore, the government preliminarily notifies the defendant that it intends to introduce at trial, pursuant to Rule 404(b), all prior criminal conduct acts or wrongs for the purpose of showing proof of a defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, and the absence of mistake or accident. This notice is only preliminary in nature and is not intended to foreclose the government from relying on other Rule 404(b) evidence should it deem the introduction of such evidence appropriate at before or during trial. The government will provide the defendant with more definitive notice of its intent to rely on 404(b) evidence when directed by the trial judge, or during trial, if the trial judge excuses pre-trial notice on the showing of good cause. In accordance with usual administrative practices of the trial court, issues relating to the admissibility and use of such evidence should be resolved by the trial judge at the time of pretrial conference in this case.

## F.    PRESERVATION OF EVIDENCE, INCLUDING NOTES

The United States has no objection to the request that the government agents retain notes taken during the investigation of this case. As a matter of routine practice, all federal law enforcement agencies already do so; and the prosecutor will request the agents to retain their notes relevant to this investigation, which notes have not resulted in the preparation of a final report. *See United States v. Wei*, 862 F. Supp. 1129, 1139 (S.D.N.Y. 1994). However, the defendant's request covers material that may not be *Jencks* material and so may exceed the government's obligation under 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2. The retention of

agents' notes is not required as long as the notes are subsequently incorporated into a final report.  *United States v. Elusma*, 849 F.2d 76, 79 (2d Cir. 1988); *United States v. Sanchez*, 635 F.2d 47, 66 n.20 (2d Cir. 1980); *United States v. Percan*, 1999 WL 13040 (S.D.N.Y. 1999); *United States v. Hilario*, 1990 WL 106831 (S.D.N.Y. 1999).  Moreover, even if retained, rough notes are not discoverable, even as Jencks Act material.  *United States v. Koskerides*, 877 F.2d 1129, 1133 (2d Cir. 1989).

## G.    GOVERNMENT'S RULE 12(b)(4)(A) NOTICE.

The government intends to use all items that the defendant has been provided with or been made aware of in accordance with Federal Rule of Criminal Procedure 12(b)(4)(A).

## H.    GOVERNMENT'S CROSS-DEMAND FOR RECIPROCAL DISCOVERY.

Pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure, the government demands that the defendant provide the government the opportunity to inspect and copy or photograph books, papers, documents, photographs, tangible objects or copies or portions thereof which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.

In addition, the government also demands that the defendant permit the government to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case or copies thereof within the possession or control of the defendant which the defendant intends to introduce as evidence in chief at trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness's testimony.

Finally, the government will demand, upon the District Court's setting a trial date and accompanying Scheduling Order, that the defendant provide a summary of any testimony that the defendant intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence at trial.

## **CONCLUSION**

The government respectfully requests that the Court deny the defendant's motions, except where indicated to the contrary above.


DATED:  Buffalo, New York, October 17, 2021


TRINI E. ROSS
United States Attorney


BY:     */s/LAURA A. HIGGINS*
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, NY  14202
716/843-5862
Laura.Higgins@usdoj.gov