UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | REPORT, RECOMMENDATION AND ORDER |
| v. | 21-CR-0007(LJV)(JJM) |
| JOHN STUART, | |
| Defendant. | |

---

        Defendant John Stuart is charged in an eight-count Indictment [8][1] with child pornography, controlled substance, and firearm offenses. These charges arise from an October 8, 2020 search warrant issued by United States Magistrate Judge Michael J. Roemer for Stuart's residence. Before the court is Stuart's motion to suppress the evidence derived from that search (Stuart's Memorandum in Support of Suppression Motion [27-2]), as well as his remaining discovery request (Stuart's Memorandum in Support of Omnibus Motion [27-1] at 6-7) and the government's cross-motion for reciprocal discovery. Government's Response [28] at 21.[2]

        Having considered the parties' submissions [27-29] and heard oral argument on November 17, 2021 [32], for the following reasons, the government's cross-motion is granted, Stuart's discovery motion is denied, and I further recommend that Stuart's motion to suppress be denied.

---

[1]     Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination.

[2]     Based on the government's representations, Stuart conceded at oral argument that his other discovery motions could be considered resolved at this time, without prejudice to renewal should new information come to light. The only motion Stuart identified as pending was his request for immediate disclosure of any evidence the government intends to introduce at trial pursuant to Fed. R. Evid. 404(b).

## BACKGROUND

The October 8, 2020 search warrant signed by Magistrate Judge Roemer for Stuart's residence located at 1010 Cleveland Drive in Cheektowaga, New York (20-mj-5207), was supported by the Affidavit of Michael Hockwater [1][3], a Task Force Officer ("TFO") with the FBI. TFO Hockwater explained that the investigation into Stuart began in August 2019, when a foreign law enforcement agency ("FLA") "known to the FBI and with a history of providing reliable, accurate, information in the past, notified the FBI that [it] determined on May 28, 2019 [an IP address later learned to be linked to Stuart and his residence] 'was used to access online child sexual abuse and exploitation material' via . . . the TARGET WEBSITE", a website known to law enforcement. Id., ¶¶6 n. 1, 24. He further noted that a user of the internet account at Stuart's residence had "been linked to an online community of individuals who regularly send and receive child pornography via a hidden service website that operated on the Tor anonymity network" (id., ¶6), a "computer network available to Internet users that is designed specifically to facilitate anonymous communications over the Internet". Id., ¶8.

TFO Hockwater noted that access required an individual to "install Tor software", which gave that individual access to websites that are "accessible only to users operating within the Tor network". Id., ¶¶9, 13. Unlike standard internet websites, the "hidden service websites" on the Tor network are "either 16 or 56 algorithm-generated characters", which are not indexed by search engines such as Google. Id., ¶¶14, 28. Thus, "[u]sers interested in accessing child exploitation material . . . use directory sites [on the Tor network] that advertise the web addresses of hidden services that contain child exploitation related content". Id., ¶28.

---

[3]   The search warrant application and warrant are docketed in 20-mj-5207. Unless otherwise noted, all citations to the search warrant materials are to the filings in 20-mj-5207.

TFO Hockwater described the TARGET WEBSITE as "a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography", which was in operation from October 2016 to June 2019, when the computer server hosting the site was seized by a FLA. Id., ¶15. When it was in operation, a message on the TARGET WEBSITE described "its purpose as being to 'share cp [child pornography] of babies and toddlers'". Id., ¶16. The name of the TARGET WEBSITE also "contained a reference to children of that age and the website logo included images depicting babies and toddlers". Id.

To access most of the TARGET WEBSITE, users needed to create an account with a username and password. Id., ¶¶18, 20-21, 25. In May 2017, the website administrator posted that "[o]nly CP contributors will have access now to the stuff", which based upon TFO Hockwater's training and experience, "effectively ma[de] membership available only to those users who uploaded child pornography to the website". Id., ¶22(a). Since "accessing the TARGET WEBSITE required numerous affirmative steps by the user", TFO Hockwater opined that "it is extremely unlikely that any user could simply stumble upon TARGET WEBSITE without understanding its purpose and content". Id., ¶30. TFO Hockwater further noted that user data from another TOR network based child pornography website established that "less than two hundredths of one percent of user accounts registered an account on the website, accessed a message thread on the website, and then never returned to the website and logged into the same account". Id., ¶29.

According to TFO Hockwater, a more recent pen register/trap and trace device, in effect from August 20 to October 6, 2020, revealed that a user of the internet service at Stuart's residence accessed the Tor network on fourteen separate days during that period. Id., ¶38. Although the TARGET WEBSITE was no longer in service at the time the search warrant

was sought, TFO Hockwater explained that, based upon his training and experience, "the fact that an internet user at the [residence] continue[d] to access the Tor network means that it is likely the user is continuing to use the Tor network for child exploitation purposes". Id., ¶39. He acknowledged that while "the Tor network contains sites other than those involving child pornography", it "contains many sites dedicated to child pornography . . . , just like the TARGET WEBSITE, and individuals [who] seek out child pornography will continue to do so even if a website they have utilized in the past is no longer in service". Id. TFO Hockwater also noted that "[i]ndividuals who have a sexual interest in children or images of children typically retain those materials . . . for many years" (id., ¶41(c)), and that "evidence of the crime is often still discoverable for extended periods of time even after the individual 'deleted' [the child pornography]". Id., ¶41(e).

## DISCUSSION

A.  **Stuart's Suppression Motion**

      Stuart argues that the search warrant lacked probable cause because it: 1) was dependent on information supplied by an "unnamed [FLA]" with "zero facts . . . [and] only bare legal conclusions" provided for its reliability (Stuart's Memorandum in Support of Suppression [27-2], §A); and 2) was "clearly stale and not of a sufficiently recent vintage to allow for a finding of probable cause". Id., §B.

      "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the

duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983). "A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993). "Deference to the magistrate, however, is not boundless . . . . reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause." Gates, 462 U.S. at 239.

### 1.  Reliability

"The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." United States v. Wagner, 989 F.2d 69, 72 (2d Cir. 1993). "Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence." Id. at 72–73.

The government argues that "[t]he FLA source of information is unlike a traditional 'confidential informant'" (government's Response [28] at 10), and points to authority that the traditional methods for testing the reliability of a confidential informant's tip are inapplicable to information provided by an FLA. See id. (*citing* United States v. Benoit, 730 F.3d 280, 285 (3d Cir. 2013) (noting that "the established legal methods for testing the reliability of this tip" not applicable where "the information on which the U.S. Coast Guard relied came from authorities with whom our country has a working relationship to prevent drug trafficking"). See also United States v. Tirinkian, 502 F. Supp. 620, 626 (D.N.D. 1980), aff'd sub nom, 686

F.2d 653 (8th Cir. 1982) (the reliability of the Royal Canadian Mounted Police is "inherent because of its status as a law enforcement agency"). In any event, even if the information provided by the FLA was not considered inherently reliable, TFO Hockwater's Affidavit sufficiently established its reliability.

Although it is not entirely clear why the FLA could not have been identified in TFO Hockwater's Affidavit,[4] the identity of the FLA was known to the FBI, and it had provided "reliable, accurate information in the past". Hockwater Affidavit [1], ¶24. In fact, the FLA and United States law enforcement agencies had a "long history" of exchanging criminal investigative information, including information concerning the investigation of crimes against children. Id., ¶26. See Benoit, 730 F.3d at 285 ("the information from Grenadian authorities passes muster even if we were to apply established legal methods for testing it's reliability . . . . [T]he source here was not only known to the DEA, but was also a repeat-player in the United States' efforts at drug-trafficking prevention"). See also Wagner, 989 F.2d at 73 ("an informant from whom the government has received consistently reliable information in the past is likely to be sufficiently reliable to establish probable cause"); United States v. McAuley, 2014 WL 7796696, *30 (W.D.N.Y. 2014), adopted, 2015 WL 540738 (W.D.N.Y. 2015), aff'd, 629 Fed. App'x 74 (2d Cir. 2015) (Summary Order) ("although Austin was a paid informant with a criminal history, he was known to [law enforcement], had met with [law enforcement] in person on multiple occasions, and had previously provided reliable information that had led to the apprehension of a fugitive. These factors weigh in favor of a finding of reliability"). The information provided by the FLA was also partially corroborated by the pen register, which

---

[4] It is well settled that law enforcement need not disclose information that "would unduly risk revealing a confidential informant's identity and exposing him or her to harm". Rivera v. United States, 928 F.2d 592, 604-05 (2d Cir. 1991); United States v. Taveras, 1995 WL 390167, *4 (S.D.N.Y. 1995).

revealed that someone at the residence was accessing the TOR network, the only means by which to access the TARGET WEBSITE during its operation. *See* Tirinkian, 502 F. Supp. at 626–27 (the reliability of the Royal Canadian Mounted Police "is not only inherent because of its status as a law enforcement agency. . . but was also established by the fact that the local agents' surveillance corroborated much of the information they had received"). Under these circumstances, I conclude that TFO Hockwater sufficiently established the reliability of the information provided by the FLA.

### 2. Staleness

Stuart argues that "[b]ecause the alleged conduct was a single instan[ce] of access almost 17 months before the warrant was issued, the information contained in the warrant was necessarily stale". Stuart's Memorandum in Support of Suppression [27-2] at 9. According to Stuart, the warrant was sufficiently stale to render the good faith exception inapplicable. Id. at 9-11.

There is "no bright-line rule for staleness". United States v. Raymonda, 780 F.3d 105, 114 (2d Cir. 2015). Staleness "must instead be evaluated on the basis of the facts of each case", with the "two critical factors" being "the age of the facts alleged and the nature of the conduct alleged to have violated the law". Id. Where there is a "pattern of continuing criminal activity, such that there is reason to believe that the cited activity was probably not a one-time occurrence, the passage of time between the last alleged event and the warrant application is less significant". Id.

The Second Circuit has recognized that the "determination of staleness in investigations involving child pornography is 'unique'", because "it is well known that images of

child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes". Id. "Crucially, however, the value of that inference in any given case depends on the preliminary finding that the suspect is a person 'interested in' images of child pornography." Id.

Therefore, "[i]n certain circumstances, courts have even inferred that a suspect was a hoarder of child pornography on the basis of a *single* incident of possession or receipt. They have done so where, for example, the suspect's access to the pornographic images depended on a series of sufficiently complicated steps to suggest his willful intention to view the files". Id. at 115 (emphasis added). In these instances, "the inference that the suspect was a collector of child pornography did not proceed merely from evidence of his access to child pornography at a single time in the past. Rather, it proceeded from circumstances suggesting that he had accessed those images willfully and deliberately, actively seeking them out to satisfy a preexisting predilection. Such circumstances tend to negate the possibility that a suspect's brush with child pornography was a purely negligent or inadvertent encounter". Id. By contrast, "[w]here the only evidence supporting a search warrant is equally consistent with a suspect's innocent stumble on an illicit website as with his deliberate access to child pornography, such evidence does not support an inference that the suspect is a 'collector' likely to hoard pornographic images past the time that his computer would overwrite the images in the ordinary course." Id. at 121.

Although here there was only a single incident of access to child pornography via the TARGET WEBSITE, TFO Hockwater's Affidavit sufficiently raised the inference that a user of the internet at Stuart's residence was a collector of child pornography. As detailed by TFO Hockwater, it was very unlikely that an individual would unintentionally access the TARGET

WEBSITE without a full understanding its purpose and content. As he explained, the TARGET WEBSITE was located on the Tor network, which was designed to allow for users to maintain their anonymity and access otherwise hidden services websites. Hence, a user would have to find the TARGET WEBSITE's 16 or 56 character web address in order to access it. Hockwater Affidavit [1], ¶28. Although the TARGET WEBSITE's address was listed on one or more directory sites on the Tor network advertising hidden services websites dedicated to the sexual exploitation of children, a user would also need to find the 16 or 56 character address for such a directory site in order to access it. Id.

TFO Hockwater explained that even if an individual had knowledge of the TARGET WEBSITE's address, it was highly unlikely that accessing the site would be a random act, since "assessing the TARGET WEBSITE required numerous affirmative steps by the user". Hockwater Affidavit [1], ¶30. As he noted, the TARGET WEBSITE required a user to create an account with a username and password to access a majority of the website, and as of May 2017, the TARGET WEBSITE made "membership available only to those users who uploaded child pornography to the website". Id. ¶¶20, 22(a), 25. Thus, this was more than an inadvertent brush with child pornography, and instead strongly suggested the images were accessed by an individual "willfully and deliberately, actively seeking them out to satisfy a preexisting predilection". Raymonda, 780 F.3d at 115.

Stuart argues that the more recent information supplied by the pen register merely established that the user continued to access the Tor network - "not, critically, *child pornography* websites". Stuart's Memorandum in Support of Suppression [27-2] at 7 (emphasis in original). While it is true that use of the Tor network alone does not *establish* that child pornography sites were accessed, it is a *reasonable inference* from the totality of the circumstances, including the

frequent (and continued) use of the Tor network shortly before the search warrant was obtained, that the Tor network was being utilized by this user to access sites similar to the TARGET WEBSITE. *See* United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983) (the "facts and any reasonable inferences to be derived from them . . . determines whether probable cause to issue a warrant is or is not present").

Probable cause "does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found". United States v. Gaskin, 364 F.3d 438, 457 (2d Cir. 2004). As Stuart argues (Memorandum in Support of Suppression [27-2] at 7), and TFO Hockwater recognized ([1], ¶39), there may be innocent explanations for the use of the Tor network, but "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause". United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985). *See also* United States v. Fiore, 2021 WL 165089, *7 (D. Vt. 2021) ("probable cause does not require a search warrant affiant to either disclose or rule out all possible innocent explanations for suspicious conduct").

Although the TARGET WEBSITE was no longer operational at the time the search warrant was obtained, Magistrate Judge Roemer was entitled to consider TFO Hockwater's opinion that "individuals that seek out child pornography will continue to do so even if a website they have utilized in the past is no longer in service" ([1], ¶39). *See* United States v. Pignard, 2007 WL 431863, *4 (S.D.N.Y. 2007) (the "Judge . . . in making her probable cause finding-was entitled to rely on the expert opinion of Detective Holihan, based upon his law enforcement expertise"); United States v. Carmichael, 2016 WL 9273619, *3 (W.D.N.Y. 2016), adopted, 2017 WL 2880116 (W.D.N.Y. 2017). *See also* United States v. Fama, 758 F.2d 834,

838 (2d Cir. 1985) ("[a] number of [courts] have ruled that an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application").

Therefore, I recommend that Stuart's motion to suppress on staleness grounds be denied. Furthermore, even if the search warrant was determined to be stale, for the reasons discussed below, I agree with the government that the good faith exception would apply.

### 3.   Good Faith

"When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted in objectively reasonable reliance on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. 135, 142 (2009); United States v. Leon, 468 U.S. 897, 922 (1984). "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant." United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011). There are "four circumstances where an exception to the exclusionary rule would not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." Id.; Leon, 468 U.S. at 923.

"The basic insight of the Leon line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue . . . . When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs . . . . But when the police act with an objectively 'reasonable good-faith belief' that their conduct is

lawful . . . or when their conduct involves only simple, 'isolated' negligence . . . the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way'". Davis v. United States, 564 U.S. 229, 238 (2011).

Even if the information set forth in TFO Hockwater's Affidavit was determined to be stale, the well developed application was not so deficient as to render law enforcement's reliance upon it unreasonable. "No hard and fast rule exists to guide law enforcement agents as to when information supporting of a search warrant becomes too stale to provide probable cause in the totality of the circumstances relevant to the assessment of probable cause to search." United States v. Ohlson, 2012 WL 913037, *5 (W.D.N.Y. 2012). At most, the circumstances here demonstrate that "exactly when probable cause becomes lacking due to the passage of time is a determination upon which reasonable judicial minds can differ". Id. *See also* United States v. Coon, 2011 WL 1871165, *6 (W.D.N.Y. 2011) ("precisely when probable cause became lacking is a judicial determination upon which reasonable minds can differ").

Nor are there any claims or indication that Magistrate Judge Roemer was misled or abandoned his judicial role. TFO Hockwater made no attempt to mask the issue of staleness. In fact, TFO Hockwater even cited a string of cases on the issue. *See* Hockwater Affidavit [1], ¶41(e) n.3. Having presented a thorough search warrant application, TFO Hockwater was not "required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested". Massachusetts v. Sheppard, 468 U.S. 981, 989–90 (1984).

In two of the cases primarily relied upon by Stuart (Coon, 2011 WL 1871165, *6 and Ohlson, 2012 WL 913037, *5), each court applied the good faith exception to a search warrant determined to be stale. Stuart offers no compelling reason why the same result should

not apply here.[5] He argues that following "Raymonda, a precedential case from the Second Circuit [that came after Coon and Ohlson], the agents should have been aware that if 9-month old information is stale in the child-pornography context, then certainly 16-month old information is too". Stuart's Reply Memorandum [29] at 4.

In Raymonda the Second Circuit recognized that it could be "inferred that a suspect was a hoarder of child pornography on the basis of a single incident of possession or receipt", where the images were accessed "in circumstances sufficiently deliberate or willful to suggest that [the internet user] was an intentional 'collector' of child pornography, likely to hoard those images - or acquire new ones - long after any automatic traces of that initial incident had cleared". 780 F.3d at 115, 117. Yet, unlike here, "[n]o such propensity-raising circumstances [were] present in the record". Id. at 117. The agent's "affidavit alleged only that, on a single afternoon more than nine months earlier, a user with an IP address associated with Raymonda's home opened between one and three pages of a website housing thumbnail links to images of child pornography, but did not click on any thumbnails to view the full-sized files. The affidavit contained no evidence suggesting that the user had deliberately sought to view those thumbnails or that he discovered www.coolib.org while searching for child pornography . . . .

---

[5]     "[W]hen assessing the officer's good faith reliance on a search warrant under the Leon good faith exception, [the court] can look outside of the four corners of the affidavit". United States v. Farlee, 757 F.3d 810, 819 (8th Cir. 2014). *See also* United States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010) ("[w]hile we may . . . [not] rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to our determination of whether the officers acted in good faith, because they contribute to our assessment of the officers' conduct in a particular case"); United States v. Williams, 350 F. Supp. 3d 261, 275 (W.D.N.Y. 2018) ("although the *in camera* testimony may not be relied upon to evaluate the sufficiency of the warrant for probable cause because it was not referenced in the warrant, it is relevant to the determination of whether the officers acted in good faith"). However, here, neither party has requested a hearing to resolve the government's reliance on the good faith exception.

Nor was there any evidence that the user . . . even saw all of the images, many of which may have downloaded in his browser outside immediate view." Id.

Although Raymonda is controlling authority and addressed an appreciably shorter delay, the circumstances there, which evidenced conduct that was "at least equally consistent with an innocent user inadvertently stumbling upon a child pornography website" (id.), were sufficiently dissimilar from the facts TFO Hockwater presented to Magistrate Judge Roemer to render his reliance on the warrant reasonable. Therefore, even if the search warrant were determined to be stale, I would conclude that the good faith exception applies, and recommend that Stuart's motion for suppression be denied.

**B.    Stuart's Motion for Disclosure of Evidence Pursuant to Fed. R. Evid. 404(b)**

Pursuant to Fed. R. Evid. 404(b)(3)(A), the government is required to provide "reasonable notice" of the prior crimes or uncharged bad acts it intends to introduce against a defendant at trial "so the defendant has a fair opportunity to meet it". At oral argument, Stuart requested immediate notice of this information. He explained in his motion that earlier notice would permit him to "file appropriate motions *in limine* prior to trial and afford the Court the occasion to make pretrial determinations regarding the admissibility of any potential Fed. R. Evid. 404(b) evidence proffered by the government". Stuart's Memorandum in Support of Omnibus Motion [27-1] at 6. However, I find the government's representation that it will "provide notice of its intention to rely upon such evidence at the time it is ordered to do so by the trial court" sufficient to address those concerns and provide Stuart with reasonable notice. Therefore, Stuart's motion is denied. *See* United States v. Vogelbacher, 2021 WL 1017126, *9-10 (W.D.N.Y.), adopted, 2021 WL 978848 (W.D.N.Y. 2021) (LJV).

C.     **Government's Cross-Motion for Reciprocal Discovery**

Fed. R. Crim. P. ("Rule") 16 "imposes reciprocal discovery obligations on defendants". United States v. Smith, 985 F. Supp. 2d 506, 522 (S.D.N.Y. 2013). The government cross-moves for the production of reciprocal discovery pursuant to Rule 16(b). Government's Response [28] at 21. Additionally, it seeks a summary of any testimony that the Stuart intends to use under Fed. R. Evid. 702, 703, or 705 at trial. Id. at 22. Since Stuart does not oppose this motion, it is granted.

## CONCLUSION

For these reasons, the government's cross-motion (government's Response [28] at 21-22) is granted, Stuart's motion for disclosure of evidence pursuant to Fed. R. Evid. 404(b) (Stuart's Memorandum in Support of Omnibus Motion [27-1] at 6-7) is denied, and I recommend that Stuart's s suppression motion (Stuart's Memorandum in Support of Suppression Motion [27-2]) also be denied. Unless otherwise ordered by District Judge Vilardo, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by December 29, 2021. Any requests for extension of this deadline must be made to Judge Vilardo. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

...

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: December 15, 2021

_____
JEREMIAH J. MCCARTHY
United States Magistrate Judge