```
 1                    UNITED STATES DISTRICT COURT

 2                    WESTERN DISTRICT OF NEW YORK

 3
       - - - - - - - - - - - - - X        21-CR-0007
 4     UNITED STATES OF AMERICA,
                      Plaintiff
 5
                  Vs.                          Buffalo, New York
 6     JOHN STUART,                            January 25, 2023
                      Defendant
 7     - - - - - - - - - - - - - X

 8
                      TRANSCRIPT OF ORAL ARGUMENT
 9            BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
                      UNITED STATES DISTRICT JUDGE
10

11                    U.S. ATTORNEY'S OFFICE
                      BY: DAVID J. RUDROFF, ESQ.
12                    Federal Centre
                      138 Delaware Avenue
13                    Buffalo, New York 14202
                      Appearing on behalf of the Plaintiff
14

15                    FEDERAL PUBLIC DEFENDER
                      BY: JEFFREY T. BAGLEY, ESQ.
16                    300 Pearl Street
                      Suite 200
17                    Buffalo, New York 14202
                      Appearing on behalf of the Defendant
18

19

20

21

22

23
                      COURT REPORTER:Brandi A. Wilkins
24                    scalisba@gmail.com
                      Kenneth B. Keating Federal Building
25                    100 State Street, Room 2120
                      Rochester, New York 14614
```

```
1              THE COURT:  Good afternoon.
2              MR. BAGLEY:  Afternoon, Judge.
3              MR. RUDROFF:  Afternoon.
4              THE COURT:  Please be seated.
5              THE CLERK:  We're on the record in criminal
6    proceeding 21-CR-0007, United States versus John
7    Stuart for oral argument.  Present in the courtroom
8    are assistant U.S. Attorney David Rudroff, defendant
9    Mr. Stuart with Assistant Public Defender Jeffrey
10   Bagley.  The Honorable Jeremiah J. McCarthy presiding.
11             THE COURT:  Good afternoon, Mr. Stuart and
12   counsel.
13             MR. BAGLEY:  Good afternoon, Judge.
14             MR. RUDROFF:  Good afternoon, Your Honor.
15             THE COURT:  All right.  This is the
16   defendant's motion to compel.  Um, let me ask
17   initially, Mr. Bagley, the Government says this motion
18   is untimely.  What's your response to that?
19             MR. BAGLEY:  Judge, I did address it in the
20   reply.  It's two-fold.  So number one, we were before
21   Judge Vilardo as the Court is aware.  Um, I raised the
22   issue of having more issues before Judge Vilardo.  We
23   referred it back to Your Honor.  Um, the Government at
24   that point took no position on it.  Um, my -- my
25   understanding of what --
```

1               THE COURT:  Who was the A -- was that Laura

2    Higgins AUSA?

3               MR. BAGLEY:  It was.

4               THE COURT:  Okay.

5               MR. BAGLEY:  Yes, Judge.  Um, my reading of

6    what occurred at that status is that it was referred

7    -- you know, the Judge could have denied my request --

8               THE COURT:  Right.

9               MR. BAGLEY:  -- to send it down to more

10   motions.  He didn't.  So my reading of what occurred

11   there is that he permitted this motion to go forward,

12   number one.

13              THE COURT:  And -- and she didn't oppose it

14   and then you asked for another extension.  I think

15   initially he said file by June something and then you

16   --

17              MR. BAGLEY:  Yeah.  All I did was ask for an

18   extension of that.

19              THE COURT:  He granted that and that wasn't

20   opposed either; right?

21              MR. BAGLEY:  I don't --

22              THE COURT:  Yeah.

23              MR. BAGLEY:  I believe that's right.

24              THE COURT:  Yeah.  David, what -- I mean, I

25   looked at the docket and it's just minute entries, but

1 it does seem that he granted the extension.  Whether

2 it should have been granted or not I guess is not for

3 me to decide.  What's your position in that regard?

4     MR. RUDROFF:  Yes, Your Honor.  My

5 understanding, and again, I wasn't the AUSA at that

6 point, was that the Government took no position and so

7 we wouldn't be precluded from arguing timeliness here.

8 I think there would have to be -- in order to consider

9 untimely motion there would have to be a finding of

10 good cause which is obviously a reason for not

11 bringing it on time as well as prejudice from not

12 bringing it.  So yeah.  We didn't take a position, um,

13 and at this point we would contend that it's untimely,

14 that there's no good cause to consider it at this

15 point.

16     THE COURT:  All right.  Well, I have your

17 respected positions in that regard, so let's turn to

18 the merits.

19     MR. BAGLEY:  Sure, Judge.  So --

20     THE COURT:  Oh.  Before I forget, Mr.

21 Bagley, just a housekeeping matter.  Um, you filed

22 some materials in redacted form and they're -- and I

23 think the unredacted materials should also be filed

24 under sealed so that we have a full record.

25     MR. BAGLEY:  Understood, Judge.

```
 1                    THE COURT:  So we have --
 2                    MR. BAGLEY:  You have those though; correct?
 3        The Court has those?
 4                    THE COURT:  Yeah.  We have those.
 5                    MR. BAGLEY:  Okay.
 6                    THE COURT:  Yeah.
 7                    MR. BAGLEY:  Um, so it's a -- I mean, part
 8        of -- I guess, to continue to address some of the
 9        untimeliness I think it ties into --
10                    THE COURT:  Well, yeah.  Well, go ahead.  I
11        mean, I have your positions on that, but go ahead.
12                    MR. BAGLEY:  Yeah.  It just ties in, Judge,
13        I think to the whole -- to the motion to compel
14        itself; right?  Because the reason that we have a
15        motion to compel at this stage after motions had been
16        filed and after Judge had ruled on one piece of the
17        motions is because essentially, Judge, as I point out
18        in the reply what we knew about the case, and when I
19        say we I mean the defense and the court because the
20        court was obviously -- not this court but Judge Roemer
21        I believe was involved -- the magistrate issuing Judge
22        was involved early in the case, um, what we knew about
23        it at that point was just the tip of the ice burg, and
24        we have learning not through government disclosures
25        that I can maybe be held accountable for, that I
```

1    should have gone through these disclosures and made

2    all of my arguments, that I should have made at that

3    point.

4              What we learned we only learned through our

5    own independent investigation, and that was in part

6    luck, in part effort, in part diligence because, um,

7    if it weren't for the fact that we had uncovered that

8    there's this much larger piece to this investigation

9    we would have all gone blithely on not knowing that --

10   that there's this investigation that essentially dates

11   back to 2017 based on what the defense has been able

12   to uncover.

13             So um, we're continuing to learn as

14   disclosures trickle in, as investigation continues

15   more and more about what it is that eventually led to

16   the search warrant that eventually led to the search

17   of my client's residence, and we're now aware that --

18   and look, I'm going to make some statements in here

19   and these statements are based on investigation that

20   I've done.  We've also been in touch with attorneys in

21   other cases that have similar issues that arise out of

22   the same websites or same servers that were seized,

23   and I want to make these statements, Judge, and

24   they're based on my investigation.  So at any point,

25   and this is part of I think the issue, that at any

1    point that I'm wrong about that it's not because I'm

2    trying to mislead the Court, but I also think the

3    Government has an obligation to tell me that we're

4    wrong or tell the Court what is actually happening

5    because this is based on what we've uncovered.  Right?

6            So what we've uncovered is that there was

7    likely a server in Brazil that was taken down somehow.

8    Part of my motion to compel is to ask how in fact it

9    was taken down.  That server was taken down and the

10   users that logged on the -- well, let's backup.  The

11   main prosecution was against the folks who hosted that

12   server, who hosted the websites associated with that

13   server.  There's more than one child pornography type

14   website that was hosted by the server on the tor

15   network.

16           So the tor network as the Court is aware is

17   designed to anonymize its users.  People who use the

18   tor network part of the reason they use it is because

19   it doesn't identify who those folks are.  So somebody

20   somewhere took down a server that hosted a website

21   that had a user that we now -- that the Government

22   claims an IP address that was then associated with my

23   client.  So there's several levels of investigation

24   that had to occur before we get to a place where we

25   get a tip from, as the search warrant identifies it, a

1    unidentified foreign law enforcement agency that's

2    then forwarded to the FBI that says this particular IP

3    address was used to access this particular website.

4            So before all that could have happened,

5    there was as I understand it years and years of

6    investigation that led to the taking down of the

7    server, the deanonymizing of the IP address and then

8    the tip that's then forwarded on to the FBI in

9    Washington who then forwards that tip on to the FBI in

10   Western New York who then applies for a search warrant

11   based on all that.

12           So all that stuff that leads up until that

13   tip even the fact of the country that passes the tip

14   on wasn't as far as I know disclosed to the issuing

15   magistrate judge.  None of that stuff before clearly

16   was identified, disclosed to the issuing magistrate

17   Judge.  So we all -- again, we learn all this stuff

18   through our own investigation and it's -- the issue,

19   Judge, is what it really boils down to is that there's

20   been no assurances made -- the assurance that the

21   court has is an assurance that the UK did nothing

22   wrong.  Right?  But there's all this stuff that

23   happened before the -- that the UK the federal -- the

24   foreign law enforcement country identified in the --

25   in the search warrant even got the tip.  Right?  So

1    there's all these issues that surfaced because all
2    this other stuff that we didn't know about now comes
3    to the surface.
4              Um, and so what this motion to compel asks
5    is for the Government to identify in the last few
6    pages of my reply these things that were done
7    essentially to lead to the tip that would lead to the
8    search warrant of my client's house.  Um, things such
9    as what agencies were involved, when the U.S. got
10   involved, documentation and information related to the
11   UK's investigation and maybe most importantly what
12   technique was used to deanonymize these IP addresses
13   which tor is intended to keep hidden.
14             So we know that they were somehow
15   deanonymized and we know that the server was somehow
16   taken down.  We know that folks got arrested and
17   prosecuted in various countries for hosting these
18   servers and for hosting -- for creating the servers
19   and for hosting these websites, but we don't know how
20   any of that was done and it raises -- it raises some
21   very serious concerns about whether those things were
22   done reliably, number one, and whether they were done
23   within the confines of the constitution because they
24   were done as far as we know in Brazil.
25             And there is a state actor here too.  That's

1   the other important piece.  The Portuguese authorities

2   after their investigation is done, and it's an exhibit

3   in my reply, issue essentially what amounts to a press

4   release and they lay out all these things that have

5   occurred throughout the years, one of which is -- or

6   more than one of which is the FBI helped us here, the

7   FBI helped us there, the FBI did this for us.  So the

8   FBI is involved in this investigation the whole time,

9   but that's never told to the issuing magistrate judge,

10  and so we don't know if -- how those -- if those

11  techniques that were used if they comply with the

12  constitution and no assurance has been made.

13          The assurance that we have is that the UK

14  did nothing wrong, but that's just tip washing, Judge.

15  That's taking, you know, years of investigation,

16  laundering it through the UK and saying the UK says

17  it's all good, don't worry about it.  That's not good

18  enough, Judge.  They have to show their work.

19          THE COURT:  Okay.  Thank you.  Mr. Rudroff?

20          MR. RUDROFF:  Yes, Your Honor.  Um, I guess

21  briefly just as a housekeeping matter, um, first and

22  foremost, the discovery motion is made pursuant to

23  Rule 16.  Now, Rule 16 compels the production of

24  existing documents and things within the Government's

25  control.  The defendant's demands are sort of phrased

1    as interrogatories essentially.  Um, I'm not aware.

2    My research hasn't turned up any authority that would

3    allow the defendant to compel the Government to

4    essentially answer interrogatories or create

5    documents.  So we read the motion as requesting

6    existing documents that would answer those questions

7    that were posed just so the Court understands, you

8    know, that position.

9         Um, now, we did turn over several documents

10   including cover documents from the FLA to the FBI.

11   The Court has those.  I believe they were submitted in

12   unredacted form by the defense in their reply.  Um, I

13   notice, just so we know what's not at issue, the last

14   line of the reply, the defendant's reply requests the

15   sealed complaint in US versus Kiter.  I obtained that

16   this morning.  I talked to Mr. Bagley.  I believe it's

17   irrelevant to this case, but we're going to turn it

18   over pursuant to the protective order.  Um, I don't

19   see any problem with that.

20        I also have a call scheduled with an

21   attorney in Washington who sort of spearheaded the

22   central aspect of this case.  Um, I've represented to

23   Mr. Bagley that my intent is to turn over whatever has

24   been voluntarily disclosed in other cases by the

25   Government.  Um, I can't guaranty once it comes in and

 1   I review it that it may not be, you know, I'm at a

 2   different view of work product or something like that

 3   but my goal is to be open about what we're turning

 4   over so there may be some further discovery.

 5          The reason I think it's worthwhile to still

 6   talk about the motion today is because I don't think

 7   it's going to resolve the defense's motion.  I don't

 8   think whatever I turn over is going to answer all

 9   those questions they posed.

10          THE COURT:  Do you know when you're getting

11   that information?

12          MR. RUDROFF:  I'm trying to schedule the

13   call with the attorney in the next couple of days.

14   Hopefully I can have whatever documents there are in

15   the next week or so.

16          THE COURT:  Uh-huh.

17          MR. RUDROFF:  Um, and again, I don't want to

18   represent on the record that I will turn over

19   everything, but it's my intent to review that and turn

20   over whatever's not privileged and potentially

21   discoverable.

22          THE COURT:  Okay, but assuming that happens

23   and assuming you turn something over to Mr. Bagley,

24   that may narrow the scope of this motion; right?

25          MR. RUDROFF:  It may, yes.  And I imagine if

1    that's the case, then we can inform the Court of how

2    the party's positions may have changed based on that.

3                THE COURT:  Okay.

4                MR. RUDROFF:  I -- as of this morning I was

5    under the impression that I had turned over everything

6    and then I was asked to give time to double check and

7    that's sort of why this is, you know, late coming to

8    the Court so I do apologize for that.

9                Your Honor, I want to address one of the

10   justifications that the defense has raised for why

11   they need this extra discovery is the potential of a

12   Franks Hearing, that they think they can challenge TFO

13   Hockwater's affidavit, but the defendant is only

14   entitled to a Franks Hearing where there's evidence

15   that he's been deliberately misleading or acted in

16   reckless disregard for the truth.  TFO Hockwater said

17   in his affidavit that the FLA informed him that no

18   U.S. computers had been searched, and I've turned over

19   to the defense the cover letter from the FLA that

20   states no computers had been searched.

21               THE COURT:  Is that the September 16, 2019

22   letter?

23               MR. RUDROFF:  Um, I'd have to -- one second,

24   Your Honor.  I apologize.

25               THE COURT:  The last -- it's -- I'll have

1    your --

2              MR. RUDROFF:  That's correct, Your Honor.

3    Yes.  The September 16, 2019 letter that's referenced

4    on Page 9 of our response.

5              THE COURT:  Okay.  Actually, I'm looking at

6    one that is attached to defendant's reply memorandum,

7    but I think it's the same letter.

8              MR. RUDROFF:  I believe that's the same

9    letter, Your Honor.

10             THE COURT:  Yeah.

11             MR. RUDROFF:  Because we did disclose it to

12   the defense.

13             THE COURT:  Okay.

14             MR. RUDROFF:  So all that is to say, Your

15   Honor, that there's no -- nothing in this record

16   creates a question as to whether TFO Hockwater was

17   deliberately misleading or recklessly disregarding the

18   truth of what was in his affidavit.  I can give some

19   background on the investigation that the defense

20   talked about.  Um, based on my conversations with one

21   of the FBI agents who was in charge of disseminating

22   the leads around the country as they came from the

23   FLA.

24             The FBI was involved in identifying a server

25   in a third country that was hosting child pornography

1    sharing websites.  They shared that essentially as a

2    lead with the country where it was being hosted.  Now,

3    it was unclear whether that was sent directly to them

4    or if it went through a clearing house Europoll to get

5    to them, but these channels of communication were

6    described to me as a series of one way streets.  It's

7    not collaborative.  The FBI doesn't go to them and say

8    here's the information and by the way, you know, we're

9    going to cooperate.  We're going to apply for a

10   warrant.  There's no cooperation.  They say we located

11   the site.  It's being hosted at this address.  Here's

12   the info.  Do what you want with it and then they step

13   back.

14          Now, at that point, the third country seizes

15   the site -- or excuse me, seizes the server, arrests

16   the person who is hosting it, does whatever they do as

17   far as deanonymizing users or simply collecting

18   anonymized users.  Again, we don't know because the

19   FBI stepped back and they then send that into the same

20   lead system.  In this case, it wound up with the FLA

21   and the FLA then took that information and sent it to

22   the U.S. with the assurance that the FLA did not um

23   search any U.S. based computers in the course of their

24   investigation.

25          So that's sort of how it happens behind the

1    scenes.  It isn't collaborative.  There isn't a back
2    and forth.  It's simply a series of lead sharing
3    between countries.  So in this case, again, the FBI
4    I've the server, sends that as a lead to the third
5    country.  Third country does whatever it does.  I as I
6    stand here do not know the investigative technique.  I
7    don't know that the FBI knows the investigative
8    technique that was used because they stepped back.
9    What I was able to discern, what was represented to me
10   was it was not a NIT, network intrusion technique.  I
11   hope I got that acronym right.  This is not the
12   operation play pen that was referenced in the original
13   motion papers.  That's, again, all that was told to me
14   but that information makes it to the FLA which is then
15   sent to the FBI.  The FBI pushes the leads out.
16           Now, when they send the leads out they send
17   the FD1057 which was a form turned over to the
18   defense.  I believe the Court has it as an exhibit.
19   They also send out as the defense has identified
20   essentially a draft affidavit that has a cover sheet
21   from an attorney at the child exploitation and
22   obscenity section.  The draft affidavit is marked up
23   by that attorney.  We have withheld those documents as
24   attorney work product.  If the Court orders, we can
25   turn it over to the Court and for an in camera review

1    as to work product, but one thing that was told to me

2    is that when these leads go out, these draft

3    affidavits go out, there's an explicit instruction for

4    whoever the on the ground investigator is to reach

5    back out to the agents sending out the lead with any

6    questions.  Make sure you are comfortable swearing

7    this out as true to the best of your knowledge and

8    belief before you do so and ask me any questions you

9    have.

10          Now, the agent who put out the leads did not

11   know off the top of her head if TFO Hockwater reached

12   out to her with questions about the affidavit, but she

13   did know that many agents around the country did.  So

14   again, I think that goes to my original point which is

15   that there's nothing in the record that even opens a

16   possibility of a Franks Hearing.  There's nothing that

17   suggests that TFO Hockwater deliberately

18   misrepresented anything or acted in reckless disregard

19   for the truth.  He did take a draft affidavit.  He

20   conformed it to this case.  He had the opportunity to

21   the check the background information with an agent and

22   he swore it out, and he did so based on the

23   representation from the FLA that no computers in the

24   country were searched.  So again, no Franks Hearing.

25          Other than that, Your Honor, um again, we

1    would rely on our papers as to the fact that there's

2    no materiality here.  Again, this is -- in our view,

3    it's a fishing expedition.  It's asking for

4    information based on press releases from other

5    countries, um, press releases from Interpol, perhaps

6    the inartful use of the word collaborative or whatever

7    words are used.  It's a series of one way streets and

8    it's lead sharing.  There's nothing in the record that

9    would raise a question as to whether the FBI acted

10   improvidently here.  So aside from that, Your Honor,

11   we would rest on our papers.

12            THE COURT:  All right.  Thanks.  Anything

13   briefly in reply?

14            MR. BAGLEY:  Yeah.  Judge, briefly.  It's a

15   lot to process.  I mean, we're still -- we're still as

16   I sat here today trying to take notes on what Mr.

17   Rudroff was saying I'm still learning new things about

18   the case as we sit here today and that's part of the

19   issue that we raise in the motion to compel, and part

20   of the issue is to why I think that the application to

21   the issuing magistrate judge was insufficient because,

22   you know, no fault of David Rudroff.  He comes into

23   this case and he's trying to get this information.  I

24   don't think he's stonewalling anybody right now, but

25   it's the United States Government that's trying to put

1    my client in jail.

2            These are questions and information that

3    should have been learned before a search warrant is

4    applied for.  And so I'm in a difficult position now

5    to process what Mr. Rudroff has said and make

6    responsive arguments to that.  It sounds like there's

7    still going to be potentially information that's still

8    going to be disclosed that may or may not affect the

9    motion at this point, Judge.  So um, I guess --

10           THE COURT:  Well, I guess what I was going

11   to suggest is that, um, you know, depending on the

12   timeframe for you, David, to get this additional

13   information, review it to see how much of it you want

14   to -- or intend to turn over to Jeff, some of which

15   may end up narrowing the issues.  I think you said

16   you're pretty confident it won't resolve things

17   entirely, but it may narrow issues.

18           Maybe what we ought to do is either

19   reconvene in a couple weeks or give you the

20   opportunity to make supplemental submissions based on

21   either what you have discussed between yourselves

22   between now and then and/or whatever document --

23   additional documents you receive from David.  If that

24   narrows some of the issues, then -- and this is aside

25   from timeliness.  Um, but if that narrows the issues,

1    obviously I'd want to hear that.  Um, so we could

2    either reconvene in a couple weeks or just give you a

3    deadline to make submissions of additional letter

4    briefs or whatever.  What would the two of you prefer?

5            MR. RUDROFF:  Um, without conferring with

6    Mr. Bagley, Your Honor, I think the legal questions

7    are still going to be the same.  The only thing that

8    might come up is if what I disclose either checks

9    something off the list or I suppose potentially adds

10   something to the list.  Um, so I guess if Mr. Bagley

11   and I can have an opportunity to convene, see how it

12   affects it and then maybe advise the court, and if we

13   feel that supplemental briefing is necessary, ask for

14   that at that point.

15           THE COURT:  Sure.

16           MR. BAGLEY:  That's essentially what I was

17   going to suggest, Judge.  Yes.  Maybe we set a date to

18   reconvene and if we think it's necessary maybe a date

19   to file papers as well if necessary.

20           THE COURT:  Okay.  So you want to reconvene

21   and submit; right?

22           MR. BAGLEY:  All of the above.  Is that an

23   option?  C.

24           THE COURT:  Yeah.  No, that's fine but

25   because what I intend to do then is run my timeframe

1    for decision from that date whatever that is.  So you

2    tell me when you want to -- what dates you're both

3    comfortable with.

4              MR. RUDROFF:  Yeah, Your Honor.  I can --

5    I'm making every effort to get whatever is going to be

6    sent to me by early next week.  So maybe two weeks for

7    me to just -- it's not going to be terabytes.  Two

8    weeks for me to get it look at it and give it to Jeff

9    and potentially convene.

10             MR. BAGLEY:  Well, then maybe two weeks for

11   that point, Judge, for me to file something if

12   necessary and then a week after that come back in.

13   Does that make sense?

14             THE COURT:  Okay.  He said two weeks and you

15   want two weeks after that?

16             MR. BAGLEY:  Two weeks from his deadline for

17   me.

18             THE COURT:  Okay.  All right.  So today is

19   January 25.  So by February 8, David, you will

20   transmit to Jeff any additional information that you

21   intend to transmit?

22             MR. RUDROFF:  That's correct, Your Honor.

23   Yes.

24             THE COURT:  Okay?  And then by February

25   22nd, um Jeff, you can make a submission as to whether

1    this has narrowed any of the issues in dispute, and

2    then we'll come back in in -- or how about maybe

3    sometime on or about March 1?

4            THE CLERK:  We could, Judge.  Everything is

5    open except 2:00 on March 1.

6            THE COURT:  Everything open except?

7            THE CLERK:  Except 2, yes.

8            THE COURT:  Okay.  You guys can tell me when

9    you want to come in.

10           MR. BAGLEY:  Yeah.  Sometime in the morning,

11   Judge, if it's available.

12           MR. RUDROFF:  I have a sentencing at 11, but

13   anything before that works for me.

14           THE COURT:  Okay.  How about March 1 at

15   10:00 or 9:30?  You tell me.

16           MR. BAGLEY:  10's fine.  Thank you.

17           MR. RUDROFF:  10:00, Your Honor.

18           THE COURT:  10:00, and then I'll run my time

19   30 days from that date; okay?

20           MR. BAGLEY:  Thank you.

21           THE COURT:  All right.  Anything further

22   then today?

23           MR. BAGLEY:  No, Judge.

24           THE COURT:  Okay.

25           MR. RUDROFF:  No, Your Honor.  I think just

1   to confirm for record purposes that the speedy trial

2   clock under H1D --

3            THE COURT:  Yeah, it's --

4            MR. RUDROFF:  The speedy trial clock is

5   stopped under 3161H1D.

6            THE COURT:  Well, yeah.  The motion remains

7   pending.  I've indicated that my 30 days will run from

8   March 1.  So that's March 31; okay?

9            MR. RUDROFF:  Yes, Your Honor.

10           THE COURT:  Time is excluded until March --

11   or through March 31.

12           MR. RUDROFF:  Yes, Your Honor.  Thank you.

13           MR. BAGLEY:  Yes, Judge.  Thank you.

14           THE COURT:  Okay.  All right.  Thank you,

15   guys.

16           (Proceeding concluded at 2:28 p.m.)

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF COURT REPORTER

 2

 3              I certify that this is a true and accurate

 4    record of proceedings in the United States District

 5    Court for the Western District of New York before the

 6    Honorable Jeremiah J. McCarthy on January 25, 2023.

 7

 8    S/ Brandi A. Wilkins

 9    Brandi A. Wilkins

10    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```